IN THE UNITED STATES DISTRICT COURTS
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

BERTHA HERNANDEZ O/B/O J.B.                                       PLAINTIFF

      v.

                              CIVIL NO.13-2239

CAROLYN W. COLVIN,[1] Commissioner
Social Security Administration                                    DEFENDANT


**MEMORANDUM OPINION**

Plaintiff brings this action on behalf of J.B., a minor child, seeking judicial review pursuant to 42

U.S.C. § 405(g), of the decision of the Commissioner of the Social Security Administration (Commissioner),

denying J.B.'s application for child's supplemental security income (SSI) benefits under Title XVI of the

Social Security Act.

**I. Background**

Plaintiff filed the current application for SSI on J.B.'s behalf on April 8, 2011. (Tr. 11.) Plaintiff

alleged that J.B. was disabled due to asthma, allergies, arthritis, brain tumor, headaches, and nose bleeds.

(Tr.138.)  An administrative hearing was held on January 18, 2012 in front of Administrative Law Judge

("ALJ") Glenn A. Neel. (Tr. 33.)  Plaintiff and J.B. were present to testify and represented by counsel. (Tr.

33.) At the time of the hearing, J.B. was 12 years old and in the sixth grade at Central Middle School. (Tr. 37.)

Prior to this application, Plaintiff filed an application on January 9, 2000, alleging that J.B. was born in June

1999 with asthma, speech problems, allergies, and a possible learning impairment. The Honorable Beverly

Stites Jones recommended that the ALJ's finding be affirmed on July 26, 2005. This recommendation was

adopted by the Honorable Robert T. Dawson on August 10, 2005. (ECF Nos. 9, 10; Civ. 04-2183.)

---

[1]Carolyn W. Colvin became the Social Security Commissioner on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin has been substituted for Commissioner Michael J. Astrue as the defendant in this suit.

The ALJ, in a written decision dated September 14, 2012, found that J.B. had the following severe impairments:  history of migraine headaches; seizure disorder; asthma; obesity; chronic joint pain/arthralgias; cognitive disorder, NOS; disorder of written expression; and math disorder. Although severe, he found that they did not meet, medically equal, or functionally equal one of the impairments listed in 20 C. F. R. Part 404, Subpart P, Appendix 1. (Tr. 14.)  He concluded that J.B. had less than marked limitation in the domain of "attending and completing tasks," "moving about and manipulating objects," and "health and physical well-being." He found no limitations in the other domains.  (Tr. 19-26.)

On September 21, 2013, the Appeals Council declined review. (Tr. 1.) Subsequently, plaintiff filed this action. (ECF No. 1.)  Both parties have filed appeal briefs, and the matter is now ready for decision. (ECF. Nos. 16, 17)

## II.  Standard of Review

The Court's review is limited to whether the decision of the Commissioner to deny benefits to the plaintiff is supported by substantial evidence on the record as a whole.  *See Ostronski v. Chater*, 94 F.3d 413, 416 (8th Cir. 1996).  Substantial evidence means more than a mere scintilla of evidence, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *See Richardson v. Pearles*, 402 U.S. 389, 401 (1971).  The court must consider both evidence that supports and evidence that detracts from the Commissioner's decision, but the denial of benefits shall not be overturned even if there is enough evidence in the record to support a contrary decision.  *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996).

In determining the plaintiff's claim, the ALJ followed the sequential evaluation process, set forth in 20 C.F.R. § 416.924.  Under this most recent standard, a child must prove that she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(c)(I); 20 C.F.R. § 416.906.

2

When passing the law, as it relates to children seeking SSI disability benefits, Congress decided that the sequential analysis should be limited to the first three steps. This is made clear in the House conference report on the law, prior to enactment. Concerning childhood SSI disability benefits, the report states:

> The conferees intend that only needy children with severe disabilities be eligible for SSI, and the Listing of Impairments and other current disability determination regulations as modified by these provisions properly reflect the severity of disability contemplated by the new statutory definition.... The conferees are also aware that SSA uses the term "severe" to often mean "other than minor" in an initial screening procedure for disability determination and in other places. The conferees, however, use the term "severe " in its common sense meaning.

142 Cong. Rec. H8829-92, 8913 (1996 WL 428614), H.R. Conf. Rep. No. 104- 725 (July 30, 1996).

Consequently, under this evaluation process, the analysis ends at step three with the determination of whether the child's impairments meet or equal any of the listed impairments. More specifically, a determination that a child is disabled requires the following three-step analysis. *See* 20 C.F.R. § 416.924(a). First, the ALJ must consider whether the child is engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(b). If the child is so engaged, he or she will not be awarded SSI benefits. *See id.* Second, the ALJ must consider whether the child has a severe impairment. *See* 20 C.F.R. § 416.924(c). A severe impairment is an impairment that is more than a slight abnormality. *See id.* Third, if the impairment is severe, the ALJ must consider whether the impairment meets or is medically or functionally equal to a disability listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). *See* 20 C.F.R. § 416.924(c). Only if the impairment is severe and meets or is medically or functionally equal to a disability in the Listings, will it constitute a disability within the meaning of the Act. *See* 20 C.F.R. § 416.924(d). Under the third step, a child's impairment is medically equal to a listed impairment if it is at least equal in severity and duration to the medical criteria of the listed impairment. 20 C.F.R. § 416.926(a). To determine whether an impairment is functionally equal to a disability included in the Listings, the ALJ must assess the child's developmental capacity in six specified domains. *See* 20 C.F.R. § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with

others; (4) moving about and manipulating objects; (5) caring for yourself; and, (6) health and physical well-being. *See* 20 C.F.R. § 416.926a(b)(1); *see also Moore ex rel. Moore v. Barnhart*, 413 F.3d 718, 722 n. 4 (8th Cir. 2005).

If the child claiming SSI benefits has marked limitations in two categories or an extreme limitation in one category, the child's impairment is functionally equal to an impairment in the Listings. *See* 20 C.F.R. § 416.926a(d). A marked limitation is defined as an impairment that is "more than moderate" and "less than extreme." A marked limitation is one which seriously interferes with a child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(2). An extreme limitation is defined as "more than marked," and exists when a child's impairment(s) interferes very seriously with his or her ability to independently initiate, sustain or complete activities. Day-to-day functioning may be very seriously limited when an impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities. *See* 20 C.F.R. § 416.926a(e)(3).

## III. Discussion

Plaintiff raises four issues on appeal: 1) the ALJ erred when he failed to find that J.B. did not have at least one marked impairment in the domain of "attending and completing tasks;"2) the ALJ erred in when he failed to find that J.B. did not have at least one marked impairment in the domain of "health and well-being;" 3) the ALJ erred  when he failed to find that J.B. did not have at least one marked impairment in the domain of "acquiring and using information;"and 4) the ALJ failed to fully develop the record. (ECF. No. 16.)

Because J.B.'s school records, benchmark tests,  intellectual ability exam, psychoeducational assessment, and neuropsychological medical evaluation are pertinent to all the domains, this information will be summarized prior to discussing each issue.

J.B.'s school performance records shows a child who repeated kindergarten, but is now getting good grades in regular classes with the aid of Section 504 modifications.  He testified at his hearing that

4

he did "average" in school, getting A's and B's in the past semester, although there was some discussion about a possible D in math that showed up on one record, but not another for the same class. (Tr. 40.) J.B.'s mother testified that he was getting A's and B's with Section 504 modifications. (Tr. 56.) A review of J.B.'s school records shows a student getting mostly A's and B's on his report cards. (Tr. 171-74.) His fifth grade teacher commented that the "written assessments have been difficult for him," but that "he has great effort and is working hard. . .He is a great student!" (Tr. 200.) The only area where she assessed him with a "Below Standards" score was in his reading performance. (Tr. 199.)

Three of J.B.'s teachers filled out the Agency Teacher Questionnaires concerning J.B.'s performance in the domains. Ms. Kara Copher, who had J.B. for Literacy classes (reading, writing, and spelling), completed a questionnaire on May 6, 2011. (Tr. 184-91). Ms. Copher noted that J.B. had displayed problems in the domains of acquiring and using information and attending and completing tasks. In the domain of acquiring and using information, she noted an "obvious problem" in expressing ideas in written form. (Tr. 185.) In the domain of attending and completing tasks, she noted that he had an "obvious problem" in carrying out multi-step instructions and working at a reasonable pace/finishing on time. She indicated that these problems occurred with a weekly frequency. (Tr. 186.) All other activities were rated as "no problem" or "a slight problem" in these domains. (Tr. 185-86.) Under the domain of medical conditions/health and physical well-being she indicated that he did not frequently miss school due to illness. (Tr. 190.)

Ms. Renee Myers completed a Teacher Questionnaire on February 9, 2012. (Tr. 202-09.) She was J.B.'s sixth grade math and science teacher. (Tr. 210.) Ms. Myers noted that J.B. had displayed problems in the domains of acquiring and using information and attending and completing tasks. (Tr. 203-04.) All other activities were rated as "no problem" or "a slight problem" in these domains.  Frequency of the problems were not indicated. (Tr. 203-04.) She noted that J.B. had several absences that year due to illness, suggested that the Agency contact the parents for an explanation. (Tr. 208.)

5

Ms. Sheri Cobley completed a Teacher Questionnaire on April 26, 2012. (Tr. 210-17.) She was also a sixth grade math and science teacher for J.B. (Tr. 210.) Ms. Cobley noted that J.B. had displayed problems in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself. All problems were listed as "slight." Where frequency of the issue was indicated, it was either monthly or weekly.(Tr. 201-17.) She did not indicate that J.B. missed school frequently due to illness. (Tr. 216.)

An undated letter from Central Middle School Principal Eddie Tipton, was sent home to J.B.'s parents indicating that he had missed nine days of school. (Tr. 183.)

J.B.'s performance on standardized benchmark tests a shows a child who may not be in the top percentiles, but who nonetheless has never scored below Basic[2] on any overall benchmark category. While J.B. was still in elementary school he received an Advanced score in Math (61st percentile), and a Basic score on the Literacy test, with a reading comprehension score in the 49th percentile and a comprehensive language score in the 3rd percentile. (Tr. 179-81.) The 3rd percentile score might have been of concern without his later benchmark scores. His performance in 2010 showed him scoring in the Advanced level in mathematics (70th percentile)and the Proficient level in Literacy, with subscores of 71st percentile for reading comprehension and 27th percentile in comprehensive language. (Tr. 194.) In 2013 he received benchmark scores of Proficient in mathematics  where he scored in the 78th percentile. (Tr. 251.) He received a Proficient score in Literacy , with a subscore in the 38th percentile for reading and the 34th percentile for language. (Tr. 252.) He received a Basic score in Science, scoring in the 45th percentile. (Tr. 253.) On none of these benchmark tests[3] has J.B. received the lowest score of "Below Basic," which would indicate a "failure to show sufficient mastery of the subject." (Tr. 179, 194, 250.)

---

[2]The four scores available on the benchmark tests are Advanced, Proficient, Basic, and Below Basic.

[3]Benchmark tests for 2011 and 2012 do not appear to be included in the record.

6

J.B. underwent an intellectual assessment evaluation by Dr. John Norwood and Dr. Wright on July 13, 2011 as part of the disability determination process. (Tr. 334.) J.B.'s Full Scale IQ was determined to be 98. (Tr. 335.) The evaluation stated that J.B. "worked at an even pace" and "was not easily distracted." (Tr. 334.) He found that J.B. was "attentive, cooperative and put forth a persistent effort with all tasks. He did not display concerns associated with attention deficit behaviors. The obtained results suggest possible learning disabilities in the areas of math and spelling." (Tr. 336.) He diagnosed J.B. with disorder of written expression and mathematics disorder. (Tr. 336.) Interestingly, he stated that Spanish was J.B.'s native language. (Tr. 334.) This is somewhat different than Dr. Testerman's finding that J.B. spoke both English and Spanish, and that Spanish was the language spoken at home. (Tr. 223.) This is in direct opposition to statements by J.B.'s teachers that English is his primary or dominant language. (Tr. 184, 202, 210.)

J.B. underwent a neuropsychological evaluation by Dr. Jeff Snow at the UAMS Department of Pediatrics on April 1, 2012. (Tr. 328.) Dr. Snow noted that he had evaluated Jacob in 2005 and found his intellectual functions to be in the average range, but his academic skills were in the low average to average range. (Tr. 328.) He noted that in the current examination, "rating scales completed by his mother and teacher yielded no clinical elevations for hyperactivity or sustained attention." (Tr. 328.) He diagnosed Cognitive disorder, NOS;  memory issues; and noted some signs of depression with environmental stressors. (Tr. 331-32.) He recommended creating a Section 504 plan for J.B., with a followup examination in two or three years and some counseling to address the environmental stressors. (Tr. 332.) He did not recommend special education classes.

J.B. underwent a psychoeducational evaluation by Paula Testerman, Ed.D on October 16, 2012 after having been referred to her by his teacher. (Tr. 223.) She found that he scored in the average range for reading and mathematics,  low average in oral comprehension, and borderline for written expression. (Tr. 224.) Her summary stated that:

> Jacob is a 13 year old student who is functioning in the high average range of intelligence. Relative strengths were identified with intellectual skills. Relative weaknesses were noted with spelling. Behaviorally, Jacob scored in the very significant range for the subtests of anxiety, depression, and cognitive disorder. All other scores fell in the non-significant range.

(Tr. 224.) She noted that J.B. "was comfortable with the testing process and was attentive to the directions that were given. Jacob worked on the items presented intently to the best of his ability. He asked questions openly to clarify directions." (Tr. 224.) She recommended curriculum modifications which included "frequent reviews, drills, preferential seating, and continuing special services."(Tr. 224.) Later in her assessment, she indicated that J.B. was not achieving adequately in reading, math, or language to meet grade-level standards. (Tr. 225.) In this section she  suggested that  "special educational services appear appropriate in addressing this student's deficit skills" in reading, math, and language. (Tr. 225.)

## A.    Attending and Completing Tasks

For this domain, the Agency considers "how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 CFR 416.926a (h). For school age children:

> When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 CFR §416.926(h)(2)(iv); *see also* SSR 09-4p.

In this case, the ALJ noted that J.B.'s intellectual assessment by Dr. Norwood and Dr. Wright in 2011 noted that he displayed effort, cooperation, and "was not easily distracted." He also noted that J.B.

8

"did not display concerns associated with attention deficit behaviors." (Tr. 21, 336.) Finally, the ALJ noted that the assessment found that J.B. was " attentive and cooperative and put forth a persistent effort in all tasks." (Tr. 336.)

The ALJ also noted that J.B.'s ADHD screening assessment in 2010 found that J.B. "had zero (0) attention and hyperactivity characteristics or identified concerns." (Tr. 21, 175.)

Finally, the ALJ referenced teacher questionnaires and J.B.'s 2011 school progress report. He noted that one teacher questionnaire May 2011 indicated the he had "obvious" but not "serious" problems with carrying out multi-step instructions and working at a reasonable pace/finishing on time. However, he noted that two other teacher questionnaires, from February and April 2012 indicated that J.B. had only "slight" problems with some activities in the category of attending and completing tasks.

Plaintiff argues that the 2011 teacher evaluation, combined with a test score on the Literacy Criterion Test ("CRT") that was below the school average, and the diagnoses of written expression disorder, mathematics disorder, and working memory deficit all require a finding of marked impairment for this domain. (ECF. 16; 7-12.)

It is well-settled in the Eighth Circuit that a mere diagnosis is not sufficient to prove disability, absent some evidence to establish a functional loss resulting from that diagnosis. *See Trenary v. Bowen*, 898F.2d 1361, 1364 (8th Cir. 1990). Thus, J.B.'s diagnoses of written expression disorder, mathematics disorder, and working memory deficit do not automatically require a finding of marked impairment without some evidence of functional loss. Such a loss is not apparent in J.B.'s records.

A review of J.B.'s school record does not show a child suffering from a marked impairment in the domain of "attending and completing tasks." He is getting good grades with his Section 504 modifications. His mother also testified he does "good" with his homework, although he needs some "motivating" to do it at times. (Tr. 51.) *See* SSR 09-4p (a school age child who can "focus long enough to

do classwork and homework" exemplifies a child who is showing appropriate development in this domain)

Further, only one teacher out of three has indicated that he had an "obvious" problem with any activities in this domain, and at that, only weekly. This report was dated 2011 and precedes two later teacher evaluations that he had only a "slight" problem in this domain in 2012. A child may have a marked limitation without daily problems in a domain. SSR 09-1p. However, in this case the two teachers who assessed J.B. most recently did not indicate that J.B. had anything more than a slight problem in this domain. Thus, J.B.'s teacher assessments overall do not appear to meet the definition of a marked impairment.  20 CFR § 416.926a(e)(2) ("We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities.")

Nor does any of the testing undergone by J.B. raise concerns about his abilities in this domain. When J.B. was assessed for ADHD in 2010, the testing indicated zero concerns for or characteristics of ADHD.(Tr. 176. )In his 2012 neuropsychological exam, Dr. Snow at UAMS stated that  that "he did not have a problem with sustained attention, nor was he impulsive in giving a response." (Tr. 328.) Dr. Testerman did not make any notations concerning hyperactivity or lack of attention in her psychoeducational exam. To the contrary,  she noted that he "worked on the items presented intently. . . .(Tr. 224.) The 2011 intellectual assessment by Dr. Norwood and Dr. Wright stated that J.B. showed persistence, an even pace of work, and that "he was not easily distracted." (Tr. 334.)

Finally, the literacy test score referred to in Plaintiff's brief was a 2009 test taken while J.B. was still in elementary school. As detailed above, he had one troubling subscore for language in elementary school, but his later benchmark tests scores in 2010 and 2013 showed his Literacy performance rated as Proficient, and no scores below Basic in any categories. Again, this single 2009 test score does not appear to reflect a limitation in these areas that interferes seriously with J.B.'s ability to perform. *See* 20 CFR §

10

416.926a(e)(4)("No single piece of information taken in isolation can establish whether you have a "marked" or an "extreme" limitation in a domain.")  Indeed, given the confusion in the record about whether his primary language is Spanish or English, and given the lack of any mention of ESL services in school, he seems to be performing admirably.

Thus, it appears that the ALJ's finding that J.B. has less than marked impairment in this domain is amply supported by substantial evidence.

**B.     Acquiring and Using Information**

For this domain, the Agency considers how well the child can acquire or learn information, and how well they use the information they have learned. 20 CFR § 416.926a(g). For school age children, this means they should be able to learn to read, write, and do math, and discuss history and science. They also need to be able to use this information in academic situations and daily living situations. 20 CFR § 416.926a(g)(iv); SSR 09-3p. School grades and achievement tests, as well as information from other sources, such as the child themselves, may be utilized in making this determination. SSR 09-3p. Getting good grades in school, particularly while placed in regular level classes, is indicative of a child who can function adequately in this domain. *Moore ex rel. Moore v. Barnhart*, 413 F.3d 718, 723 (8th Cir. 2005)(child with low scores on achievement tests and IQ of 61, but with good grades in classes is able to acquire and use new information); *Scales v. Barnhart*, 363 F.3d 699, 703-05 (8th Cir. 2004)(hearing impaired child with IQ of 62 who was in regular classes for many subjects, performed adequately in many subjects, and interacted well with others, required court to affirm the finding of no disability by the Commissioner.)

In finding that J.B. did not have a marked impairment in this domain, the ALJ noted J.B.'s diagnosis of written expression and mathematics disorder, as well as his repeat of kindergarten. He referenced school progress reports and all teacher questionnaires. (Tr. 20.)

11

The record indicates that J.B. has been diagnosed at one time or another with cognitive disorder, memory issues, disorder of written expression, mathematics disorder, and possible learning disorders.

However, a mere diagnosis is not sufficient to prove disability, absent some evidence to establish a functional loss resulting from that diagnosis. *See Trenary,* 898 F.2d at 1364 (8th Cir. 1990). There is nothing in the record to suggest that a finding of marked impairment is required. J.B. has been assessed with an IQ of 98. (Tr. 335.) He is getting mostly A's and B's in school while placed in regular classes. He himself reports that he is doing "average" and getting mostly A's and B's. His mother testified that he is getting good grades. His scores on his achievement tests have never scored him below Basic in mastery level, and he often earns an Advanced or Proficient level score. A neuropsychological examination found that J.B.'s intellectual functions were in the average range, and his academic skills were in the low average to average range. (Tr. 328.) A psychoeducational evaluation found J.B. to be "functioning in the high average range of intelligence." (Tr. 224.)

Thus, it appears that the ALJ's finding that J.B. has less than marked impairment in this domain is amply supported by substantial evidence.

### C.    Health and Physical Well-Being

In this domain the Agency considers the "cumulative physical effects of physical or mental impairments and their associated treatments or therapies" on the child's functioning. 20 CFR § 416.926a(I)  This domain "addresses how such things as recurrent illness, the side effects of medication, and the need for ongoing treatment affect a child's body; that is, the child's health and sense of physical well-being." SSR 09-8p. Ultimately, the concern is "whether a child feels well enough and has sufficient energy to engage in age-appropriate activities, either alone or with other children." SSR 09-8p.

In finding that J.B. has less than marked impairment in this domain, the ALJ referenced J.B.'s medical history and treatments, as well as examinations which noted him to be "well developed with age appropriate overall appearance and good hygiene." (Tr. 26.)

Other than simply listing some of J.B's physical impairments, Plaintiff only argues that he missed school on a regular basis to visit the neurologist in Little Rock and his medications made him sleepy. He noted that Ms. Meyers noted that Plaintiff had several absences that year. ( 13-14.)

The record does indicate that Ms. Meyers noted several absences, but instructed the reader to ask his parents as to the cause. The school also sent an undated letter about 9 absences.  However, the two other teachers who filled out questionnaires did not indicate that J.B. had excessive absences. A review of the supplied attendance reports from Central middle school shows a total of 9.50 absences between August 2011 and November 2011. (Tr. 173.) Given that the school letter states that 15 absences in one semester are excessive, it appears that J.B.'s absences do not meet that standard.  J.B.'s mother testified that his medications make him sleepy. However, none of J.B.'s teachers note any issues with this sleepiness or other medication side effects. In fact, none of them knew if he was taking any medication. (Tr. 190, 208, 216.)

Given the lack of evidence in this domain, and given J.B.'s good school performance, the ALJ's finding that J.B. has less than marked impairment in this domain is supported by substantial evidence.

**D.      Failure to Develop the Record**

Finally, Plaintiff argues that the ALJ should have sought further clarification from J.B.'s teachers and doctors regarding his impairments, but does not give any specific information as to what crucial information was missing from the record.

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant. *Stormo v. Barnhart,* 377 F.3d 801, 806 (8th Cir. 2004). The ALJ does not "have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Id.* (citing *Snead*, 360 F.3d at 839).

Plaintiff does not proffer, and this Court cannot discern, exactly what additional crucial information might have been needed by the ALJ to render his decision. The record contains school records, medical records, teacher questionnaires, benchmark tests, and evaluations of J.B.'s intellectual, neuropsychological, and psychoeducational capabilities and issues. The ALJ obtained two of the teacher questionaires and ordered the intellectual assessment from a consulting examiner. If there was any crucial information missing from this evidence, it was Plaintiff's duty to identify that lack. She did not do so. Therefore, Plaintiff did not meet her burden of persuasion.

Thus, the ALJ did not err in record development.

**III.  Conclusion**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decisions, and thus the decision should be affirmed. The undersigned further finds that the Plaintiff's Complaint should be dismissed with prejudice.


DATED this 27th day of January, 2015.


/s/ *Mark E. Ford*
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)